# The Franklin Fire Insurance Company *versus* Brock.

1. A policy of insurance on a building had this condition: "The following risks being considered more hazardous than others, *buildings* intended to be occupied by persons carrying on any of the undermentioned trades or business, or in which any large quantities of the undermentioned goods are deposited, will be subjected to an extra premium on that account. No policy, therefore, will be construed to extend to such a risk, unless liberty be given for the purpose, and expressed thereon." One of the specifications of such risks was, "mills and manufactories of any kind." With the consent of the company the tenant kept hay, straw, produce, &c.; this he gave up and kept broom-corn and made brooms by hand. *Held*, this did not come within the prohibition of "mills and manufactories."

2. A mill within the meaning of the prohibition is not merely a place where something might be ground, nor a manufactory merely where something may be made by hand or machinery, but what common usage recognises as a mill or manufactory respectively.

3. Two adjoining houses of the same owner were insured by one company at the same time, but in two distinct policies. *Held*, that the policies were distinct contracts, and that the assured could recover for damage by fire to one building, although the other building may have been used in a manner prohibited by the policy and the fire originated in it.

4. A premium for insurance above the usual rate, is evidence indicating though not proving that a more than usual risk was assumed; but a jury should not infer that a concealed or misrepresented fact was to be at the risk of the insurers. Per Strong, J.

5. Describing a building insured as a "storehouse," is descriptive only, and not a warranty or representation that nothing should be done in it but keeping a store or a storehouse. *Id.*

6. A *storehouse* was insured, and keeping broom-corn was not specified as a hazardous risk; the assured had a right to keep broom-corn there. Keeping it did not prevent his recovery for damage to the building by fire, because the danger was greater by keeping it, or because the fire originated in it. *Id.*

7. A policy enumerating certain risks as hazardous, does not cover any of them unless liberty be given to keep the articles, &c., mentioned as hazardous. *Id.*

8. If words in a policy are of doubtful signification, the meaning most favorable to the assured is to be adopted. *Id.*

January 7th and 8th 1868. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. STRONG, J., at Nisi Prius.

Certificate from the Court of Nisi Prius.

This was an action of covenant on two policies of insurance, brought to July Term 1866, No. 22, by the executors, &c., of John Brock, deceased, to the use of John Welsh, against The Franklin Fire Insurance Company of Philadelphia.

On the 3d of December 1857 John Brock was the owner of two five-storied brick storehouses, now numbered 242 and 244, on the west side of North Delaware Avenue, Philadelphia. On that day The Franklin Fire Insurance Company executed and delivered to him a policy of perpetual insurance, No. 26,321, for $6000 on No. 242, at a premium of $300, and policy No. 26,322 for $6000

[Franklin Fire Insurance Co. v. Brock.]

on No. 244, at a premium of $240. Each building was described in the policy as "a five-story brick storehouse with cast-iron front," &c., "with privilege to occupy as a ship chandlery store;" and referred to surveys of corresponding numbers.

Survey No. 26,321 contains the following:—

"This building is occupied as a ship-chandler store, and a sail-loft in the upper story; the partition-wall between this and the adjoining building on the north side, in the fifth story, has been taken away, making the two in one room, and occupied as a sail-loft."

Survey No. 26,322 contains the following:—

"This building, in the fifth story, is occupied as a sail-loft, in connection with No. 67, the partition-wall being taken away: and for further description see survey No. 26,321 on file in this office." No. 67 is now No. 242.

In No. 26,322 was "Privilege to store merchandise generally, gunpowder, gun-cotton, saltpetre excepted."

The policy was made subject to certain conditions annexed to it, the fourth and tenth of which are the following:—

"4. The sum insured on one building, and the contiguous buildings on the same lot, may be insured in one policy; but there shall not be insured in one policy a greater number of buildings than are erected on a single lot.

"10. The following risks being considered more hazardous than others, buildings intended to be occupied by persons carrying on any of the undermentioned trades or business, or in which any large quantities of the undermentioned goods are deposited, will be subjected to an extra premium on that account. No policy, therefore, will be construed to extend to such a risk, unless liberty be given for the purpose, and expressed therein.

"Section I.: Academies and school-houses; apothecaries and druggists; china, glass and queensware; corn and grain; flax and hemp, in bales; groceries and liquors; lumber of all kinds; naval stores and ship chandlery; oils and paints; prints, pictures and looking-glasses; saltpetre and sulphur.

"Section II.: Bookbinders; boat-builders; coopers; chair-makers, windsor; printers; type founders; turners; taverns, oyster cellars and eating-houses.

"Section III.: Aquafortis and vitriol, in quantities; brewers and maltsters; bakers; carpenters; cabinet and musical instrument makers; chandlers, soap and tallow; chemists; coach and carriage builders and wheelwrights; distillers; flax and hemp, loose; gunpowder; hay, straw and provender; mills and manufactories of any kind; rope-makers; steam-engines; sugar refineries; stables, public or private; tallow, melters of; varnish and oil, boilers of."

On the 23d of February 1859 John Brock conveyed both these

[Franklin Fire Insurance Co. *v.* Brock.]

buildings to John Welsh; on the 4th of March in the same year he assigned both policies to Welsh, and the assignments were approved by the company.

On the 30th of January 1866 a fire occurred, by which the southernmost building, No. 242, covered by policy No. 26,321, was injured to an amount beyond $6000, and the other building to the amount of $4925.

The company having declined to pay the loss, this suit was brought for its recovery.

On the trial before Strong, J., the plaintiffs gave evidence that William B. Johns, in April or May 1863, informed the president of the company that Welsh had agreed to rent to him No. 242, and that Welsh had directed him to ascertain whether his business would increase the risk. Johns told the president that he was going into the hay and straw business; the ship-chandlers were about moving away. A surveyor was sent, and after he had made his return, Johns was informed at the defendants' office that there was no additional risk or premium. Johns continued the hay, straw and produce business until November 1865. After that time he went "into the broom-corn business and all the materials sold by broom-makers." For the last year that was his business; it did not take up one-tenth of the room taken by hay and straw. He occupied three floors; the broom-corn in bales occupied a space of thirty feet on the Water street front, " the remainder of the store back was nothing but racks against the wall, brooms, then guano." The office occupied sixteen feet of the second story, the shop was about twenty feet square over the office, having a glass partition. In manufacturing, the corn was taken out of the bales, thrown into boxes and cut into the lengths, dipped into the water, put into the bleaching-room, where there was a large cast-iron stove with a carpenter's glue-pot on the grate, a pot with water and one with sulphur; the corn is wired on to the handles, then put into a vice to flatten them, &c. The brooms were of three sizes, from ten to twenty-four pounds per dozen. There were forty or fifty tons of broom-corn on the premises at the time of the fire.

Johns was of opinion that the fire did not originate in his building.

The plaintiffs proved that a sail-loft is a place for *manufacturing* sails.

Mr. Blackburn, the fire marshal, testified that he had been present at the fire, had made several examinations of the premises subsequently, and was of opinion that the fire originated in the bleaching-room. There was other testimony somewhat conflicting as to the place in which the fire originated.

The plaintiffs gave evidence under exception that good stoves were insured at $2\frac{1}{2}$ per cent. deposit.

[Franklin Fire Insurance Co. *v.* Brock.]

Judge Strong, after stating some preliminary facts, charged the jury :—

" The defendants, however, insist that they are not liable to make good the loss, or any part thereof, because, as they allege, after the policies were issued, such an alteration was made in the use of No. 242, the southernmost building, as to enhance the risk assumed, to make it greater than was contemplated, and because the alteration excluded the property insured from all protection by the policy, according to the stipulations of the tenth condition attached.

" It is also insisted that, inasmuch as the two policies were taken out on the same day by Mr. Brock, any increase of the hazard (by Mr. Brock, or any one claiming under him) to one of the buildings, affects his right to hold the company bound by the policy covering the other, an adjoining building, and therefore that there can be no recovery for the loss caused by the partial destruction of No. 244.

" This renders it necessary for you to inquire what has been done by the person insured, or by any persons who were tenants under him.

" There is evidence submitted to you that, in the spring of 1863, when Mr. Johns was about to take a lease of. No. 242, with a view to go into the hay, straw, feed and produce business there, the Messrs. Welsh, one of whom was then the owner of the policies, sent their clerk to the defendants to inquire whether, if such a business should be carried on there, the building would be considered covered by the policy, or whether an additional premium would be required ; and that to the inquiry the defendants replied, in substance, ' it was all right, that it was no additional risk.'

" Keeping hay, straw and provender, you will notice, when you look at the tenth condition of the policy, was regarded as an especially hazardous risk, and it was declared that no policy would be construed to extend to such a risk unless liberty be given for the purpose, and expressed thereon. Yet, if the testimony is to be believed, it may be concluded the defendants understood the policy as covering such a risk. In connection with this may also be considered the rate of premium demanded and deposited, with the evidence that it was above the usual rate, indicating, though not proving, that more than an ordinary risk was intended to be assumed.

" An extraordinary premium furnishes some reason for presuming that an extraordinary risk was represented, though from a high rate of premium alone a jury ought not to infer that a concealed or misrepresented fact was understood to be at the risk of the insurers.

" But what has Mr. Brock, or Mr. Welsh, or any tenant holding under Mr. Welsh, done to avoid the policies ?

[Franklin Fire Insurance Co. *v.* Brock.]

" It is in evidence that Mr. Johns, a tenant of Mr. Welsh, was permitted to enter No. 242, and to keep hay, straw and produce there, after Mr. Bancker had said that it was all right, that no additional premium would be required, or something to that effect. Johns kept those articles until November 1865, when he gave up the hay business, and went into keeping broom-corn, and making brooms to some extent, as has been described to you by the witnesses. The mode in which this was done, and the extent to which it was carried, has been detailed before you.

" It is not alleged that keeping broom-corn, or even making brooms, increased the risk above what it would have done had Mr. Johns continued to keep hay, straw and produce, but it is said it was an increase of the hazard above that undertaken by the words of the policy, and that the manufacturing the corn into brooms took the building out of the policy altogether, and left it entirely uninsured.

" Whether the risk was increased or not depends upon the question, what risk was assumed. The subject insured is called a storehouse. That, I think, is descriptive only, not a warranty or representation that nothing should be done in it but keeping a store or a storehouse.

" Whether manufacturing brooms in it did add to the hazard is a question of fact.

" Whether the fire was caused by keeping the corn, or by its manufacture, so far as it was manufactured, has been considerably debated. I do not propose to say much in regard to this.

. " Mr. Blackburn thinks it originated from the bleaching-room, which you have had described to.you. He speaks, however, very hesitatingly. All the witnesses testify that it was first seen nearly midway between Delaware Avenue and Water street, at considerable distance from the bleaching-room, or at least, that there was the body of the fire, and there the principal destruction. One witness testifies that the fire was entirely out in the bleaching-room before he left the store in the afternoon of January 30th 1866; and the witness who first saw the fire, tells you that the smoke came first out of the third story window on Water street, the story above that in which the bleaching-room was.

" I do not conceive this, however, to be a matter of primary importance.

" *A storehouse* was insured, and the policy does not enumerate keeping broom-corn as a hazardous risk, either requiring an increased premium, or taking the building in which the corn was kept out of the contract of insurance. The assured had a right to keep broom-corn there, and his doing so, either by himself or his tenants, was no violation of any condition or representation. And if it was not, he is not debarred a recovery in this action by the fact that the danger of fire was made greater by keeping

broom-corn than it would have been had the broom-corn not been kept there, or by the fact that the fire actually originated in the broom-corn, if you believe it did.

" A more important question is, whether by anything that was done by Mr. Johns, the tenant, the building was taken out of the protection of the policy. You will observe the insurance is of the building, not of its contents."

The judge here read the tenth condition.

" This is a part of the contract. No policy covers any of the hazardous risks enumerated, unless liberty be given to keep the articles mentioned, or to carry on the kinds of business specified.

" You will observe that the catalogue of things which a policy does not cover, unless specially described and allowed, contains three classes. *One* is personal property, as china, flax, groceries, hay, aquafortis, &c. These are not insured by a policy covering generally personal property, without any farther designation.

" Another is certain trades or occupations. Buildings in which such trades are carried on (bookbinders, coopers, printers, bakers, distillers, &c.), are not covered by any policy, unless liberty be given to carry them on, and expressed in the policy itself.

" The third class is real estate, and all that is enumerated is, ' academies and school-houses,' ' taverns, oyster cellars and eating-houses,' ' mills and manufactories of any kind,' ' stables, public and private,' and ' sugar refineries.'

" In examining this list, you will see that *manufacturing broom-corn into brooms* is not one of the *kinds of business* denominated hazardous, and requiring to be specially allowed, in order that the building in which it may be carried on may be covered by the policy. The store No. 242 is not therefore uncovered by the policy, merely because Mr. Johns made or manufactured brooms therein.

" Nor is it outside of the policy, and unprotected by it, merely because Mr. Johns kept brooms there. No condition required that such articles should not be kept.

" But was the store converted into a manufactory, within the meaning of the word, as used in the catalogue of those kinds of real estate, not insured without special agreement? This is a very important question, which I submit to you.

" The tenth condition attached to the policy, in which it is declared that a policy shall not be construed to extend to mills and manufactories of any kind, has reference to the character of the real estate, rather than to the uses to which it may be put. The building must itself be a mill or a manufactory, or it does not come within the tenth article. The fact that articles are made or manufactured in a dwelling-house or a store, does not, of course, make it a *manufactory* within the meaning of this

policy. Had clothes been made in the store, and had a sewing-machine been introduced, and worked there, a jury would hardly find that it had become a manufactory, and therefore no longer insured.

"Is not a manufactory, or a factory, a building, the *main*, or principal design, or use of which is to be a place for producing articles, as products of labor?

"There is no difficulty in understanding what is meant, when we speak of a factory or manufactory. It is something more than a place where things are made.

"You would probably hardly speak of a photograph establishment as a manufactory, or a painter's studio, or a bookbinder's shop, or a printing office.

"It is undoubtedly true that a building may be insured as a store, or a dwelling-house, which may afterwards be converted into a factory. If it be, under such a policy as these, it ceases to be insured. But it by no means follows that the partial use of it for making articles for use or sale makes it a manufactory.

"The collocation of the words in this condition is of considerable weight in determining what the parties meant. Not only are the kinds of manufacturing business excepted from the policy named, but the real estate excepted is called 'mills and manufactories.' This would seem to indicate what was in the minds of the parties, *mills and manufactories*, something known, recognised, called a mill (not merely a place where something might be ground), but what common usage recognises as a mill. A manufactory (not merely a place where something may be made by hand or machinery), but what in common understanding is known as a factory.

"If words in a policy are of doubtful signification, that meaning is to be adopted which is most favorable to the assured.

"Then, gentlemen, you will inquire from the evidence whether this storehouse had, before the fire, become not a storehouse but a manufactory. Had it ceased to be a storehouse, and become a building of a different character?

"Upon this subject I refer you to the evidence. That it was a storehouse at the time it was insured is not denied. In November 1865 Mr. Johns began to make brooms out of broom-corn he had stored.

"He had a small vice, for pressing, and he had a small bleaching-room. He did not, however, lay in broom-corn exclusively to be manufactured by himself. He kept it for sale—supplied manufacturers around him. Was making brooms his principal business then? or was it only incidental—an adjunct to his main business, keeping a store? It appears he not only kept broom-corn for sale, but he kept other articles—phosphate of lime, in barrels.

[Franklin Fire Insurance Co. v. Brock.]

" All the evidence on this subject is submitted to you, and you will find whether this building, 242 Delaware avenue, was, on the 30th of January 1866, a manufactory or a storehouse.

" If it had not then been converted from a storehouse into a manufactory, the plaintiff is entitled to recover, and there is no defence to the claim of the plaintiff upon either of the policies.

" Your verdict should then be for the plaintiff for the amount of the loss upon both buildings, with interest from sixty days after the proof of the loss was furnished to the defendants.

" It is not disputed that such proof was furnished.

" If, on the other hand, the building 242 was, on the 30th of January 1866, a manufactory, as distinct from a storehouse, plaintiff is not entitled to recover for the destruction of that building ; and his only right would be to recover the loss on 244, which is agreed to be $4925, with interest, &c.

" I decline to instruct you, as requested, that the plaintiff cannot recover for the loss on the northernmost building (No. 244), if the fire was caused by the manufacturing of brooms in No. 242, or even if it had been converted into a manufactory. The policies do not constitute one entire contract."

The defendants excepted to the charge.

The verdict was for the plaintiffs in the sum of $11,454. The jury also found that the fire did not occur by the manufacturing of brooms.

The defendants removed the case to the Supreme Court, where they assigned for error, the admission of evidence as to the rates of insurance, and the charge of the court, in 15 specifications.

*G. W. Biddle* and *Meredith*, for plaintiffs in error, cited Glenn v. Lewis, 8 Exch. Rep. 607 ; Steinmetz v. Franklin Fire Ins. Co., Dist. Court of Philada., Leg. Int. August 11th 1865 ; Stebbins v. The Globe Ins. Co., 2 Hall 632.

*J. Fallon*, for defendants in error, cited Catlin v. Springfield Ins. Co., 1 Sumner C. C. Rep. ; Baker v. Ludlow, 2 Johns. C. Rep. 289 ; Pim v. Reid, 6 Man. & G. 1 ; Boardman v. Ins. Co., 8 Cushing 583 ; Equitable Ins. Co. v. Langdon, 6 Wend. 627 ; Moore v. Ins. Co., 29 Maine 97 ; Rafferty v. N. Brunswick Ins. Co., 3, Harr., N. J. 480 ; Fire Ass. of Phila. v. Williamson, 2 Casey 196 ; Gutteridge v. Munyard, 7 Carr. & P. 129 ; Wood v. Hartford Ins. Co., 13 Conn. 533, 546.

The opinion of the court was delivered, February 27th 1868, by
READ, J.—This action was brought on two policies of insurance, dated the 3d December 1857, for $6000 each, on two distinct five-story brick storehouses, on the west side of Delaware avenue, and extending through to Water street. Each storehouse

7 P. F. SMITH—6

covering the whole of its respective lot.   The present numbers of these storehouses are No. 242 and No. 244 North Delaware avenue.

. The fourth condition in each policy is, " The sum insured on one building and the contiguous buildings on the same lot, may be insured in one policy ; but there shall not be insured in one policy a greater number of buildings than are erected on a single lot."

Each policy was, therefore, by the express declaration of the defendants made a separate and distinct contract, unconnected with any other policy on any building on any other lot.

On the 30th January 1866, a fire took place which damaged No. 242 to more than the amount insured, and No. 244 to the extent of $4925.   By the surveyors it appears the partition-wall between the buildings " in the fifth story had been taken away, making the two in one room, and occupied as a sail-loft."

In the policy No. 242 there was a " privilege to occupy as a ship-chandlery store," and the premium was $300, or 5 per cent., this being considered one of the greatest risks.   The tenant of these premises kept hay, straw and provender, and was in the feed and produce business, which on inquiry at their office, the defendants said, in substance, " it was all right, that it was no additional risk," although regarded as an especially hazardous risk, as appears by the tenth condition of the policy.

In November 1865, the tenant gave up the hay business, and went into keeping broom-corn, and making brooms to some extent, but in a comparatively small way.   It was not alleged that the keeping and selling brooms or broom-corn vitiated the policy, and the jury expressly found that the fire did not occur by the manufacturing of brooms.

The question then narrows itself down to this: does the making of brooms come within the words mills and " manufactories of any kind," in the 3d section of the tenth condition of the policy ?

To this question we think our brother Strong gave the proper answer in his charge to the jury.   " Is not a manufactory or a factory a building, the main or principal design or use of which is to be a place for producing articles as products of labor ?   There is no difficulty in understanding what is meant when we speak of a factory or manufactory.   It is something more than a place where things are made."

" The collocation of the words in the condition is of considerable weight in determining what the parties meant.   Not only are the kinds of manufacturing business excepted from the policy named, but the real estate excepted is called ' mills and manufactories.'   This would seem to indicate what was in the minds of the parties, mills and manufactories, something known, recognised, called a mill (not merely a place where something might be ground),

[Franklin Fire Insurance Co. v. Brock.]

but what common usage recognises as a mill. A manufactory (not merely a place where something may be made by hand or machinery), but what in common understanding is known as a factory."

This appears to us the true construction and meaning of these words. The theory of the defendants requires the word manufactories should be read manufactures, which we shall certainly not do.

Our learned brother was therefore right in saying to the jury, if it had not been converted from a storehouse into a manufactory the plaintiff was entitled to recover, and that there was no defence to the claim of the plaintiff upon either of the policies.

Judgment affirmed.